UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
                                          :
UNITED STATES,                            :
                                          :
                    Plaintiff,            :
                                          :       98 Civ. 7076 (BSJ)
          v.                              :
                                          :
VISA U.S.A., INC., ET Al.,                :       **Opinion & Order**
                                          :
                                          :
                    Defendants.           :
                                          :
------------------------------------------x
**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

     Defendant MasterCard International Incorporated

("MasterCard") moved to enforce the Court's October 9, 2001

judgment in this case, <u>United States v. Visa U.S.A., Inc.</u>, 163

F. Supp. 2d 322, 410 (S.D.N.Y. 2001) (the "Final Judgment")

against Defendant Visa U.S.A., Inc. ("Visa") on January 10,

2005.[1]  (<u>See</u> MC Mot. Enforce, Doc. No. 334.)  The Court appointed

Special Master Paul Shechtman to determine whether Visa's By-Law

3.14 violates the Final Judgment.  (<u>See</u> Order of Aug. 18, 2005

---

[1] The materials reviewed by the Court include, <u>inter</u> <u>alia</u>: MasterCard's Motion to Enforce ("MC Mot. Enforce"), the Report of the Special Master ("Report"), Visa's Objections to the Report ("Visa Obj."), MasterCard's Memorandum in Support of its Motion to Adopt the Report ("MC Adopt Mem."), Visa's Opposition to MasterCard's Motion to Adopt the Report ("Visa Opp."), MasterCard's Memorandum in Opposition to Visa's Objections ("MC Opp."), Visa's Reply in Support of its Objections ("Visa Reply"), MasterCard's Reply in Further Support of its Motion to Adopt ("MC Reply"), MasterCard's exhibits ("MC Ex."), Visa's exhibits ("Visa Ex."), the transcript of the evidentiary hearing before the Special Master ("Tr."), deposition transcripts ("[Witness] Dep."), the transcript of a subsequent hearing before the Special Master on March 14, 2006 ("Hearing Tr."), the transcript of a conference between the parties and the Special Master on July 6, 2006 ("Conf. Tr."), and the transcript of oral argument before the Court on April 23, 2007 ("Oral Arg. Tr.").

("Order of Reference").)  The Special Master issued a Report in
which he concluded that By-Law 3.14 violates the Final Judgment.
(See Report 32-36.)  Visa objected to all of the Special
Master's principal findings and conclusions, and MasterCard
moved to adopt them.  For the reasons stated herein, the Court
adopts the findings of fact and conclusions of law in the
Report.

**Background & Procedural History**

The Court presumes familiarity with the factual background
giving rise to these proceedings.  (See Report 1-3.)  As
relevant here, Paragraph III.C of the Final Judgment provides:

> Each Defendant is enjoined from enacting, maintaining,
> or enforcing any by-law, rule, policy, or practice
> that prohibits its issuers from issuing general
> purpose or debit cards in the United States on any
> other general purpose card network.

163 F. Supp. 2d at 410.  After entering the Final Judgment,[2] the
Court granted Visa's and MasterCard's motions for a stay pending
appeal.  See United States v. Visa U.S.A., Inc., No. 98 Civ.
7076, 2002 U.S. Dist. LEXIS 25086 (S.D.N.Y. Feb. 7, 2002).

Visa enacted By-Law 3.14 on June 20, 2003, while the appeal
was pending.  (MC Ex. 162.)  By-Law 3.14 provides that if one of
Visa's 100 largest issuers moves its debit portfolio from Visa
to MasterCard, that issuer must pay Visa a fee, known as the

---

[2] This Court entered the Final Judgment in United States v. Visa U.S.A., Inc.,
No. 98 Civ. 7076, 2001 U.S. Dist. LEXIS 20222 (S.D.N.Y. Nov. 26, 2001) after
reviewing comments and objections from the parties in United States v. Visa
U.S.A., Inc., 183 F. Supp. 2d 613 (S.D.N.Y. 2001).

Settlement Service Fee ("SSF").[3]  The SSF represents that issuer's proportionate share of Visa's remaining settlement obligation arising from <u>In Re Visa Check/MasterMoney Antitrust Litigation</u>, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) (the "Wal-Mart" litigation).[4]  Visa's total settlement obligation from the Wal-Mart litigation was just over $2 billion,[5] payable in annual installments of $200 million over ten years.[6]  (Dahir Dep. 62:16; 64:19-21; 67:3-7.)

---

[3] The SSF applies as follows:
> If any Visa check card Issuer among the largest 100 Issuers, measured by sales volume achieved during the year ending September 30, 2002, reduces its Visa-branded check card Issuance such that Its sales volume is ten percent less than in that year, the Member would be required to pay a Settlement Service Fee. The fee would be the amount of the unpaid settlement payments represented by the proportion of the Issuer's sales volume on check cards during the year ended September 30, 2002, to the total of all sales volume on check cards during that year.

MC Ex. 162.  Visa revised the SSF in September 2003 (<u>see</u> MC Ex. 174 (applying SSF only to issuers who deliberately switch brands)) and November 2003 (<u>see</u> MC Ex. 181 (applying SSF only to issuers who switch to MasterCard, not those who switch to American Express or Discover)).  Based in part on this latter revision, the Department of Justice agreed to take no position as to whether the SSF violates the Final Judgment.  (<u>See</u> Letter from M. Dashefsky to Special Master (Feb. 1, 2006).)

[4] For example, if a bank's share of Visa's total debit volume were 5%, and if that bank were to switch to MasterCard, Visa would exact an SSF equal to 5% of the outstanding settlement balance.  (Report 4.)

[5] At oral argument before the Court, Visa claimed that while Visa's settlement obligation from the <u>Wal-Mart</u> litigation was $2 billion, the SSF represents each bank's proportionate share of only $1.2 billion.  (Oral Arg. Tr. 27:8-15.)  In its objections to the Report, however, Visa acknowledges that the SSF is calculated as a percentage of the total $2 billion settlement obligation.  (<u>See</u> Visa Obj. 5 n.4.)  The correct figure is immaterial to the outcome of these proceedings.

[6] Under generally accepted accounting principles, Visa had to book the entire discounted value of the settlement obligation immediately, amounting to a $1 billion accounting loss.  (Dahir Dep. 68:21-24.)  This caused a financial crisis for Visa.  (Dahir Dep. 66-69.)  Visa's balance sheet shifted from positive $500 million in capital to negative $500 million (Dahir Dep. 68:3-11), which put Visa in default of outstanding capital notes (Dahir Dep. 69:2-

Visa began renewing or re-signing long-term contracts with its member banks in 2003, while the appeal of the Final Judgment was pending.  (See Report 33; MC Ex. 306.)  MasterCard filed a motion to enjoin Visa from enforcing the SSF on September 23, 2003, which the Court denied for lack of jurisdiction due to the pending appeal.  (See Order of Dec. 8, 2003 at 3 & n.2, 5 & n.3; Order to Show Cause (Sept. 23, 2003), Doc. No. 288.)  By early 2004, Visa had renewed long-term contracts with most of its member banks, essentially locking up 89% of the volume of its top 100 debit issuers.[7]  (See Report 33; MC Ex. 306.)

The Second Circuit affirmed the Final Judgment in United States v. Visa U.S.A., Inc., 344 F.3d 229 (2d Cir. 2003), cert denied, 543 U.S. 811 (2004).  The Final Judgment became effective on October 15, 2004 (the "effective date"), after the Supreme Court denied certiorari.  (See Letter from W. Stallings to Judge Jones (Oct. 21, 2004) (endorsed Oct. 27, 2004), Doc. No. 321.)  On January 10, 2005, MasterCard again moved to enforce the Final Judgment against Visa, arguing that the SSF violates Paragraph III.C of the Final Judgment.  (See MC Mot. Enforce.)

---

7) and in violation of multiple loan covenants with general creditors (Dahir Dep. 69:14-19).  Visa is a non-profit association of member banks and does not accumulate cash resources, so it lacked the cash to make even its first payment.  (Dahir Dep. 68.)  Visa urgently needed a loan in order to make the payment, and Visa implemented the SSF in order to ensure sufficient future cash flow to convince lenders to loan Visa the money.  (Dahir Dep. 103; 106.)

[7] Visa commands 80% of the offline debit market.  (See MC Opp. 17.)

In an Order dated August 12, 2005, the Court interpreted Paragraph III.C of the Final Judgment as follows:

> Paragraph III(c) prohibits any by-law, rule, policy or practice that imposes "loss of membership" as a penalty for issuing competing cards; that "effectively prevents" member banks from issuing cards on competing networks; or that is a "significant cause" of member banks' inability to do so profitably.

(Order of Aug. 12, 2005 at 3-4.)  Soon after, the Court appointed the Special Master to determine whether the SSF violates the Final Judgment.[8]  (See Order of Reference.)

At the time of his appointment in August 2005, the Special Master had the benefit of two rounds of discovery, first in 2003 and again in 2005, as well as legal briefing related to MasterCard's January 10, 2005 Motion to Enforce.  (See MC Mot. Enforce; Letter from P. Thomas to P. Shechtman (Sept. 12, 2005); Letter from P. Thomas to P. Shechtman (Sept. 20, 2005); Order of Dec. 8, 2003; Order of Aug. 12, 2005; Order of Reference.)  The Special Master then held a series of conferences, oversaw another round of discovery, held a five-day evidentiary hearing that involved live testimony from eight witnesses, reviewed post-hearing briefing, and heard oral argument.  (Report 3; see Letter from P. Thomas to P. Shechtman (Oct. 16, 2005); Letter from P. Thomas to P. Shechtman (Nov. 11, 2005); Hearing Tr.)

---

[8] The Court circulated a draft of the Order of Reference for comment before issuing it, and neither party suggested any alterations or additions.  (See Letter from R. Vizas to Judge Jones (Aug. 12, 2005); Letter from P. Thomas to Judge Jones (Aug. 17, 2005).)

The Special Master also reviewed hundreds of exhibits and deposition testimony from 15 witnesses.  (Report 3.)  He then circulated a draft of his Report and held a conference on July 6, 2006 to hear argument and receive comments.  (See Conf. Tr.) The Special Master issued his Report on July 7, 2006.

In his Report, the Special Master concluded that the SSF effectively prevents Visa banks from switching to MasterCard in violation of the Final Judgment.  (Report 33-36.)  The Special Master also concluded that contempt standards do not govern this proceeding (Report 32), and that evidence from before the effective date of the Final Judgment is relevant in determining whether Visa violated the Final Judgment after that date (Report 33).  On July 27, 2006 Visa objected to all of the Special Master's principal findings and conclusions, and MasterCard moved to adopt the Report on the same day.  Their motions were fully submitted as of August 24, 2006.  The Court notified the parties of its principal findings and conclusions, which are now reflected in this Opinion and Order, during a telephone conference on March 20, 2007, and it held oral argument with respect to the proper scope of the Court's remedy on April 23, 2007.

For the reasons stated herein, the Court adopts the Special Master's Report and concludes that the SSF violates the Final Judgment.

**Discussion**

**I.    Standard of Review**

The Court must decide de novo all objections to findings of fact and conclusions of law made by the Special Master.  Fed. R. Civ. P. 53(g)(3)-(g)(4).  In acting on the Report, the Court may adopt or affirm; modify; wholly or partly reject or reverse; or resubmit to the Master with instructions.  Fed. R. Civ. P. 53(g)(1).

**II.  Contempt Standards**

Visa claims that MasterCard's motion sounds in contempt, and that the Special Master erred by not applying the more demanding standards applicable in contempt proceedings.[9]  (Visa Obj. 8-12.)  Specifically, Visa argues: (1) that as a procedural matter, a party may enforce a court order only through a contempt proceeding; and (2) that contempt standards should nevertheless apply here in light of the nature of MasterCard's proposed remedy.  Visa is mistaken on both accounts.

A motion to enforce is an appropriate procedural vehicle for parties to seek compliance with a court order.  See, e.g., Pena v. New York State Div. for Youth, 708 F.2d 877 (2d Cir.

---

[9] To support a finding of contempt, the moving party must establish: (1) that the order violated was clear and unambiguous, (2) clear and convincing proof of non-compliance, and (3) that the contemnor has not diligently attempted to comply in a reasonable manner.  King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995).

1983) (affirming where district granted motion to enforce and did not apply contempt standards); Sanchez v. Maher, 560 F.2d 1105, 1108 (2d Cir. 1977) (same); Vassell v. Reliance Sec. Group, 328 F. Supp. 2d 454, 462 (S.D.N.Y. 2004) ("[The] motion is properly characterized as a motion to enforce the judgment previously entered."); Martens v. Smith Barney, Inc., No. 96 Civ. 3779, 2003 U.S. Dist. LEXIS 11587, at *10-12 (S.D.N.Y. July 9, 2003); see also Universal Outdoor, Inc. v. City of New Rochelle, 286 F. Supp. 2d 268, 273 (S.D.N.Y. 2003) (recognizing that parties seeking redress for violations of a court order can do so in ways other than a contempt action).[10]

In giving effect to its prior orders, this Court has broad equitable authority to fashion an appropriate remedy, and a finding of contempt is not a prerequisite for enforcement. Berger v. Heckler, 771 F.2d 1556, 1569 (2d Cir. 1985) ("Ensuring compliance with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt."); Alexander v. Hill, 707 F.2d 780, 783 (4th Cir. 1983) ("[T]he

---

[10] Courts in other circuits also recognize motions to enforce as procedurally proper without applying contempt standards. See, e.g., Nat. Res. Def. Counc. v. Texaco Ref. & Mktg., Inc., 20 F. Supp. 2d 700, 707 (D. Del. 1998) ("A motion to enforce the judgment is the proper method to seek the Court's assistance in interpreting a prior order."); Breslow v. Prudential-Bache Props., Inc., No. 91 Civ. 1230, 1995 U.S. Dist. LEXIS 13617, at *1, 7-8 (N.D. Ill. Sept. 15, 1995) (granting motion to enforce final judgment enjoining party from seeking arbitration); Jones v. Cleland, 515 F. Supp. 212, 213 n.1 (N.D. Ala. 1981) ("[A motion to enforce] is the proper method to seek this Court's assistance in interpreting its judgment."); United States v. City of Detroit, 476 F. Supp. 512, 520 (E.D. Mich. 1979) (enforcing prior judgment and citing "the broad range of equitable powers available to this court to enforce and effectuate its orders and judgments").

lack of a finding of contempt or of bad faith should not preclude exercise of inherent equitable powers to achieve fair remedial results."); Class v. Norton, 376 F. Supp. 496, 501 (D. Conn. 1974) (noting court's "'broad discretionary power' . . . to fashion equitable remedies" to give effect to its prior orders), aff'd in relevant part and rev'd in part on other grounds, 505 F.2d 123 (2d Cir. 1974) (quoting Lemon v. Kurtzman, 411 U.S. 192, 200 (1973)); cf. United States v. New York Tel. Co., 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act [28 U.S.C. § 1651] as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued . . . .").

Although contempt standards may be appropriate where sanctions are sought or imposed, see, e.g., Martens v. Thomann, 273 F.3d 159 (2d Cir. 2001); United States v. Dist. Council of New York City & Vic. of the United Bhd. of Carpenters & Joiners., No. 90 Civ. 5722, 2004 U.S. Dist. LEXIS 22308, at *16-20 (S.D.N.Y. Nov. 3, 2004); Perfect Fit Indus., Inc. v. Acme Quilting Co., No. 77 Civ. 2004, 1984 U.S. Dist. LEXIS 15405, at *30-32 (S.D.N.Y June 29, 1984), such is not the case here. As explained in Part VI, infra, the equitable remedy sought and imposed in this case is not a sanction.

The cases relied upon by Visa are to no avail.  In Thomann, for example, the motion to enforce included sanctions against class counsel.  See 273 F.3d at 164.  Here, by contrast, the Motion to Enforce is advanced against a party and does not include sanctions.  On remand, the district court distinguished Thomann on precisely these grounds from cases which did not apply contempt standards.  See Martens, 2003 U.S. Dist. LEXIS 11587, at *10-12 (S.D.N.Y. July 9, 2003).

EEOC v. New York Times Co., 196 F.3d 72, 80-81 (2d Cir. 1999) also does not weigh in favor of applying contempt standards here.  In New York Times, the Second Circuit was faced with two issues: first, whether certain conduct violated a consent decree; and, second, whether certain other conduct violated a subsequent order that the district court had entered to effect compliance with the consent decree.  The Court applied contempt standards only in its review of the latter.  In bifurcating the contempt analysis, New York Times highlights that while contempt standards are appropriate in some cases -- such as where a party violates a subsequent enforcement order -- contempt standards are not necessarily applicable where, as here, conduct violates an underlying prior order.  See id.; see also Berger, 771 F.2d at 1569 n.19 (refusing to apply contempt standards and citing the district court's "basic authority to compel compliance with its orders").

Because contempt standards do not govern the instant proceedings, MasterCard must demonstrate only by a preponderance of the evidence that Visa's SSF violates the Final Judgment. For the reasons stated herein, MasterCard has met its burden.[11]

## III. The Special Master's Ultimate Conclusion that the SSF Violates the Final Judgment

Visa's primary objection is that the weight of the evidence does not support the Special Master's factual findings and ultimate conclusion that the SSF violates the Final Judgment. (Visa Obj. 23-25, 39-45.)  The Court disagrees.  The Special Master considered evidence from seventeen banks, four that switched from Visa to MasterCard and thirteen that remained with Visa.  He heard live testimony from executives at MasterCard, Visa, and six issuing banks.[12]  He also reviewed 15 depositions and hundreds of exhibits.  (Report 3.)  As the Special Master properly found, the record easily shows by a preponderance of the evidence that the SSF effectively prevents Visa member banks from switching to MasterCard in violation of Paragraph III.C of the Final Judgment.  (See Order of Aug. 12, 2005 at 3-4; United States v. Visa U.S.A. Inc., 163 F. Supp. 2d at 410.)

_____

[11] Although contempt standards do not apply, the record also shows by clear and convincing evidence that Visa's SSF violates the Final Judgment for all the reasons discussed herein.

[12] Three of these six issuing banks switched from Visa to MasterCard and three did not.

Visa and bank executives considered the SSF a cost of conversion that MasterCard would have to reimburse.  Visa and MasterCard use so-called "hard dollar" financial incentives -- e.g., signing bonuses, marketing support, and compensation for costs of conversion such as issuing new plastic cards -- to persuade issuing banks to switch from one network to the other.[13] (Tr. 162; Tr. 785-86; Report 10-11; 35.)  The SSF for most banks is quite sizable in relation to the total incentive package offered by MasterCard.  (See Report 11 & n.16 (chart).)

The evidence shows that the SSF de-valued MasterCard's incentive package on essentially a dollar-for-dollar basis.  (MC Ex. 194 at 096080; see MC Ex. 18 at 0193, 0211 ("MasterCard's substantial recent offer is not enough to outweigh Visa's exit penalty and the above incentives.").)  This follows intuitively -- if MasterCard offered a Visa member bank an incentive package to convert to MasterCard, but the bank first had to pay Visa an SSF in order to receive the incentive package, the bank would reduce the dollar value of the incentive package by the dollar value of the SSF in making its brand-switching decision.  (See, e.g., MC Ex. 170 (illustrating that Visa expected the SSF to force MasterCard to increase the size of its incentive package

---

[13] The parties agree that banks typically require networks to pay all costs of conversion.  (See Visa Obj. 18; Tr. 166.)

by the amount of the SSF); MC Ex. 167 (same); see also Report 10-11, 15, 35-36.)

The Court agrees with the Special Master that, because banks make the brand-switching decision "at the margin," the SSF is large enough in relation to MasterCard's incentive package to effectively prevent a bank from switching.  (Report 35.)  The weight of the evidence, which includes the testimony of Visa executives as well as Visa's own internal conversion analyses, confirms this conclusion.[14]

a. Testimony of Visa Executives and Internal Visa Documents

Visa's former Executive Vice President of Finance and current CFO, Neil Williams, testified that Visa "never included the collection of any [SSF] money in any of our . . . projections [because] we weren't expecting to collect the money."  (Williams Dep. 140-41.)  Visa's former Chairman of the Board, Patrick Phillips, testified that the SSF would have the same effect as assessing the settlement obligation against a

_____

[14] While the bulk of a bank's debit card earnings comes from interchange revenue, Visa and MasterCard do not compete for banks' business by promising higher interchange rates.  (Report 8; Tr. 478-79, 652, 1191-92.)  Banks deem Visa and MasterCard roughly equal in terms of interchange revenue, which represents the fees that issuing banks receive from merchants for completing debit transactions.  (Report 9-10; Tr. 965-66, 1166-67, 1173; United States v. Visa U.S.A., Inc., 163 F. Supp. 2d at 331-334.)  Visa's own conversion analyses explicitly assume parity with MasterCard in interchange revenue.  (See, e.g., MC. Ex. 348 at 067147 ("Interchange revenue not considered in analysis as it is assumed to be equal for both associations."); MC Ex. 167 at 06432 ("Assumes Visa and MC Interchange are equal.").)  Even though interchange revenue eclipses hard-dollar financial incentives in size, it is the incentives that drive a bank's brand-switching decision, since most banks deem interchange revenue "pretty much a wash."  (Tr. 653.)

member bank in one lump payment.  (Tr. 999).  This "would [have
been], basically, disastrous to [the banks'] income
statement[s]," according to Visa's former CFO, Victor Dahir.
(Dahir Dep. 89, 124.)

      This testimony demonstrates that Visa executives knew, and
indeed intended, that the SSF would effectively prevent member
banks from switching to MasterCard.  Their testimony in this
regard is corroborated by Visa's internal documents.  For
example, Visa's Senior Vice President of Finance, Johnny Dorsey,
drafted a memorandum to prepare Victor Dahir for a meeting about
whether to adopt the SSF.  Dorsey wrote: "Having a formidable
exit penalty decreases the cost of renewing contracts with large
Partners on a nearly dollar-for-dollar basis. . . . [T]his
prevent[s] a large Debit player from leaving and it saves us
money on renewing deals."  (MC Ex. 194 at 096080.)  A Visa
interviewer quoted Visa's Executive Vice President of
Interchange Strategy, William Sheedy, as saying: "Settlement
Service Fee -- Banks are now committed to us whether they like
it or not."  (MC Ex. 267 at 103933.)  Visa also prepared
conversion analyses which demonstrate that Visa assumed
MasterCard would have to compensate member banks for their SSF
obligations in order to persuade them to switch.  (See, e.g., MC
Ex. 166; MC Ex. 167 at 006432; MC Ex. 170 at 014237; MC Ex. 171
at 014830.)  Moreover, Visa's June 2003 Proforma Balance Sheet

and Cash Flow Summary did not include the collection of SSF
payments during the ten years in which the SSF would be in
effect.  (MC Ex. 412.)

 b. Testimony of Bank Executives and Bank Documents

    The effect of the SSF was just as Visa intended.  The CEO
of TCF Financial Corporation ("TCF"), William Cooper, wryly
described the prohibitive effect of the SSF on TCF's brand-
switching decision:  "Book 22 million dollars in a quarter, then
I'd get a real nice stock price.  It's very prohibitive."
Cooper Dep. 132-33.  A Senior Vice President at Associated Bank,
Val Glytas, testified that in light of the SSF he "filed
[MasterCard's offer] in the garbage can" and switched to
MasterCard only after MasterCard agreed to indemnify Associated
for the cost of the SSF.  (Tr. 615-16, 625-27, 695-96.)  A
Senior Vice President at Washington Mutual, Douglas Marshall,
testified that at the time his bank was making its brand-
switching decision, he told a colleague that the SSF is "going
to be a major, major issue for us." (Tr. 464.)  Washington
Mutual switched only after MasterCard agreed to a package that
amounts to roughly 50% indemnification of its SSF.  (See Tr.
558-59, 582-87; MC Ex. 132; MC Ex. 147; Report 29-30.)

    This testimony is also corroborated by documents from
issuing banks.  Branch Banking and Trust Company ("BB&T")
discounted MasterCard's offer by the estimated $20 million SSF

15

that BB&T would have had to pay if it had switched.  (See MC Ex.
1 at 0031.)  The Executive Vice President of National City Bank
("NCB"), Sarah Hartman, wrote in an email message: "When [the
SSF] is taken into account, Visa is effectively the only way we
could go."  (MC Ex. 7 at 000546.)  A Wells Fargo executive,
Kevin Rhein, characterized the SSF as a "show stopper."  (MC Ex.
61 at 023296.)[15]  An internal Wells Fargo memo states: "there was
no sense having any other conversation.  There should be no
doubt in [MasterCard's] mind that getting the business would
require [MasterCard] to reimburse [the SSF]."  (MC Ex. 33 at
001.)  The SSF was essentially an exit penalty or exit fee, and
the record is replete with documents characterizing it as such.
(See, e.g., MC Ex. 1 at 0031; MC Ex. 59 at 014355; MC Ex. 61 at
023296; MC Ex. 100 at 075871; MC Ex. 104 at 077052; MC Ex. 153
at 003384; MC Ex. 194 at 096079.)

    c. Visa's objections

    Despite this evidence, Visa argues that the Report makes no
factual finding that the SSF actually prevented any of the
seventeen banks considered by the Special Master from switching.
(Visa Obj. 41-42.)  Visa is incorrect.  The Special Master
explicitly concluded that "[s]ome banks did not convert because
of the SSF, and others converted only after receiving full or
substantial compensation."  (Report 35.)  That the Special

---

[15] This document contains minutes of a meeting between MasterCard and Wells
Fargo executives.  The author of the document is not named.

Master did not state a finding with regard to each of the
seventeen individual banks does not undermine his ultimate
conclusion.

Visa also claims that the Special Master relied on
testimony from banks for which the Special Master did not find
the SSF played a major role in their brand-switching decisions.
(Visa Obj. 39-41.)  However, evidence from these banks is
nevertheless probative as to the brand-switching decisions of
banks in general.

Visa further argues that, for banks that did switch,
indemnification was not a significant factor.  (Visa Obj. 44-
45.)  The weight of the evidence supports the opposite
conclusion.  Associated switched only after MasterCard agreed to
indemnification.  (See Tr. 625-27, 695-96.)  Washington Mutual
required roughly 50% in SSF indemnification before it switched,
and it accepted less than 100% because it predicted that the SSF
was not enforceable.  (See Tr. 558-59, 582-87; MC Ex. 109; MC
Ex. 132; MC Ex. 147; Report 27-30.)  First Midwest demanded that
MasterCard prepare a new offer once it learned of the SSF.
(Report 30.)  The new offer included a "sign on bonus," which
First Midwest viewed as compensation for its SSF exposure.
(Report 31; MC Ex. 438; MC Ex. 439.)  While the record is "more
murky" with regard to Bank of the West, MasterCard "agree[d] to

17

indemnify Bank of the West if it had to pay the SSF." (Report 26-27; <u>see</u> Tr. 1287; MC Ex. 212 at 0058.)

Accordingly, the record shows by a preponderance of the evidence that the SSF effectively prevents Visa issuing banks from switching to MasterCard in violation of the Final Judgment.

**IV.  Visa's Evidentiary Objections**

Visa also argues that the Special Master erred by relying on evidence from before the effective date of the Final Judgment, and that much of that evidences is inadmissible hearsay.  The Court rejects these challenges for the following reasons: (1) the Special Master was entitled to rely on evidence from before the effective date of the Final Judgment because such evidence is highly probative of the SSF's prohibitive effect after that date; (2) the Special Master was not bound by the Federal Rules of Evidence; (3) even if the Special Master had stringently applied the Rules, the vast majority of the challenged evidence would have been admissible; (4) even if the Court were to disregard all the evidence challenged by Visa under the Rules, ample evidence would remain to support the Special Master's ultimate conclusion that the SSF effectively prevents Visa banks from switching to MasterCard in violation of the Final Judgment.

a. Evidence pre-Dating the Effective Date of the Final Judgment

Visa claims that the Special Master erred by relying primarily on evidence from before the October 15, 2004 effective date of the Final Judgment,[16] and that that there is insufficient evidence from the period after the effective date to support the conclusion that the SSF violates the Final Judgment.[17]  (Visa Obj. 25-30.)  Visa's objection, and its reliance on Tekkno Labs. Inc. v. Perales, 933 F.2d 1093, 1099 (2d Cir. 1991), is misplaced.

In Tekkno, the Second Circuit ruled that a court cannot "hold a party in contempt retroactively to a time at which no valid court order had been entered."  933 F.2d at 1099. However, Tekkno involved a contempt proceeding -- which this is not -- and nothing in Tekkno precludes the Court from considering evidence from before the effective date in determining that Visa engaged in prohibited conduct after the

---

[16] The Special Master did not rely solely on evidence from before the effective date.  For example, First Midwest and MasterCard apparently executed their agreement in July 2005, after the Final Judgment became effective.  (MC Ex. 265.)  The Special Master found that First Midwest had internally allocated a $2 million "signing bonus" from MasterCard to cover its potential SSF cost (see MC Ex. 439), and the bank probably would not have switched without it (see Report 31).  In addition, the chart included in the Report shows that, as of September 2005, the SSF devalued a MasterCard offer by 35-65%.  (See Report 11.)

[17] It is no surprise that the record after the effective date is so sparse. Visa locked up virtually all its major issuers by renewing or re-signing most of its member banks to long-term contracts after the issuance of the Final Judgment but before its effective date.  (See Report 33; MC Ex. 306.)  Thus, few banks made brand-switching decisions after the effective date.

effective date.  The ultimate inquiry is whether Visa has engaged in conduct prohibited by the Final Judgment, and it was entirely proper for the Special Master to rely on evidence from before the effective date of the Final Judgment in making this determination.  If the SSF prevented banks from leaving Visa before the effective date, it follows that the SSF also prevented banks from leaving Visa after the effective date, because there was no material change in circumstances between the two time periods.  Since Visa is the party that promulgated the SSF, the effect that Visa expected the SSF to have is highly probative of the effect it actually did have.[18]

Visa argues that United Air Lines, Inc. v. Evans, 431 U.S. 553 (1977), requires the Court to limit the weight it places on evidence from before the effective date of the Final Judgment, but Evans does not control here.  In Evans, the Supreme Court ruled that evidence relating to a past act of discrimination that was not acted upon within the applicable limitations period "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences."  Id. at 558. The Evans court held that no present violation existed.  Id.

---

[18] While Visa's expectations are probative on this point, the Court agrees with the parties and the Special Master that Visa's motives for adopting the SSF are not relevant.  (See Report 32.)

The instant case, by contrast, involves evidence relating to a continuous, ongoing violation of a court order.  If a Visa bank were to make its debit brand choice today, the SSF would effectively prevent that bank from switching to MasterCard, just as it did in the period before the effective date of the Final Judgment.[19]

Accordingly, Evans is distinguishable and does not control here,[20] and the Special Master properly relied on evidence pre-dating the effective date of the Final Judgment.[21]

   b. Evidence Inadmissible Under the Federal Rules of Evidence

Visa also objects to all findings of fact and conclusions of law in the Report that rely upon evidence that would have

---

[19] Another case cited by Visa -- DeNovellis v. Shalala -- is also distinguishable on this basis.  124 F.3d 298 (1st Cir. 1997).  In DeNovellis, the First Circuit refused to rely on evidence of a discriminatory act that took place before the effective date of the relevant antidiscrimination statute, even though the effects of the discriminatory act continued into the period after the statute's effective date.  Id. at 309-10 & n.5.  Here, by contrast, the SSF constitutes a present, ongoing violation of the Final Judgment.  It is not merely an effect or consequence of a past act.

[20] Even if it did apply, Evans explicitly permits the Court to rely on evidence from before the effective date, and it does not prevent the Court from relying primarily on such evidence.  See Evans, 431 U.S. at 558; see also Fitzgerald v. Henderson, 251 F.3d 345, 365 (2d Cir. 2001) ("A statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during that period."); Letter from M. Dashefsky to Special Master (Feb. 1, 2006) (discussing Evans).

[21] The Court envisioned in its December 8, 2003 Order that, if the Final Judgment were upheld on appeal, and if MasterCard then returned to this Court to seek relief, the Court would have to rely on evidence from before the effective date of the Final Judgment.  The Department of Justice illustrated this point in its correspondence with the Special Master.  (See Letter from M. Dashefsky to Special Master (Feb. 1, 2006).)

been inadmissible had the Special Master applied the Federal
Rules of Evidence ("Rules of Evidence").  In particular, Visa
argues that much of the evidence relied upon by the Special
Master in the "Bank Evidence" section of the Report is
inadmissible hearsay.[22]  (Visa Obj. 31-39; Report 15-31.)  The
Court concludes that the Special Master was not bound by the
Rules of Evidence for the following reasons.

The Second Circuit has not addressed whether a special
master must apply the Federal Rules of Evidence.  This Court did
not direct the Special Master to apply the Federal Rules of
Evidence (see Order of Reference), and the current version of
Federal Rule of Civil Procedure 53 contains no language
suggesting that a special master must apply the Rules of
Evidence where, as here, the order of reference is silent on the
matter.  See Fed. R. Civ. P. 53 (2006).[23]

In general, a special master has "broad discretion to
regulate the manner in which he will complete his duties."

---

[22] The evidence challenged on this basis includes, inter alia, MasterCard
Exhibits 5, 36, 41, 47, 59, 61, 68, 94, 100, 104, 105, 109, 117, 132, 137,
142, 212, 263, 415, 434, 435, 438, and 439.

[23] MasterCard argues that a special master is not required to apply the Rules
of Evidence because the December 1, 2003 amendments removed language to the
contrary from Rule 53.  Compare Fed. R. Civ. P. 53(c) (2002) ("When a party
so requests, the master shall make a record of the evidence offered and
excluded in the same manner and subject to the same limitations as provided
in the Federal Rules of Evidence for a court sitting without a jury."), with
Fed. R. Civ. P. 53 (2006) (omitting same language), and Fed. R. Civ. P. 53(c)
notes of advisory committee on 2003 amendments ("The most important
delineation of a master's authority and duties is provided by the Rule 53(b)
appointing order.").

_United States v. Clifford Matley Family Trust_, 354 F.3d 1154,

1161 (9th Cir. 2004); _cf._ _Schneider v. Feinberg_, 345 F.3d 135,

149 (2d Cir. 2003) (discussing broad discretion of special

master).  The courts and commentators that have addressed this

issue have all concluded that -- absent explicit direction by

the court to the contrary -- a special master is not bound by

the Rules of Evidence.  _See_ _Matley_, 354 F.3d at 1160-61 (holding

that a special master did not have to follow the Rules of

Evidence where the district court's order of reference did not

require him to do so); _Allapattah Servs. v. Exxon Corp._, No. 91-

0986, 2006 U.S. Dist. LEXIS 91611, at *10 (D. Fla. Dec. 15,

2006) ("Strict adherence to . . . the Federal Rules of Evidence

is not required in this matter." (citing _Matley_, 354 F.3d at

1160)); 9-53 James Wm. Moore Et Al., Moore's Federal Practice ¶

53.32 (2006) ("There is no requirement that a master performing

an adjudicatory function adhere to the . . . Federal Rules of

Evidence, absent a reference order that so requires." (citing

_Matley_)).  This Court agrees.[24]

_____

[24] The Court can find no other circuit that has directly addressed whether a
special master must apply the Rules of Evidence.  The Fourth Circuit,
laboring under an old incarnation of Federal Rule of Civil Procedure 53,
ruled that a commission created pursuant to Rule 53 need not "rule on the
admissibility of testimony and exclude that which was incompetent," so long
as the commission provides a report that describes in sufficient detail "what
use, if any, it had made of such testimony in arriving at its valuations."
_United States v. Cunningham_, 246 F.2d 330, 334 (4th Cir. 1957) (vacating
where district court adopted commission report lacking detailed findings).
The Special Master here, in contrast to the commission in _Cunningham_,
produced a detailed Report making abundantly clear which evidence he relied
upon and to what extent, thereby enabling this Court to review his individual

Visa appears to argue in the alternative that, even if Federal Rule of Civil Procedure 53 did not require the Special Master to apply the Rules of Evidence, this Court must apply the Rules of Evidence in conducting its review of the Report.  (Visa Obj. 31.)  Visa's reliance on Rules of Evidence 101 and 1101 is misplaced.  While these provisions establish the broad applicability of the Rules to proceedings in the courts of the United States, see Fed. R. Evid. 101, 1101, it would be incongruous and inefficient if the Federal Rules of Civil Procedure were to permit a hearing officer to conduct an evidentiary hearing without applying the Rules of Evidence and then require a reviewing court to apply the Rules of Evidence when conducting its review.[25]  Moreover, Matley implicitly contradicts Visa's position.  See 354 F.3d 1154.[26]

---

findings as well as the trustworthiness and relevance of the evidence upon which he relied.

[25] By rough analogy, a district court is not bound to apply the Rules of Evidence when reviewing the findings of an administrative agency.  See, e.g., Ellers v. Railroad Ret. Board, 132 F.2d 636, 639 (2d Cir. 1942); McDowell v. Goldschmidt, 498 F. Supp. 598, 608 (D. Conn. 1980) ("In evaluating the evidence on which an agency relies, the [district] court is not bound by the fact that the evidence is technically hearsay; rather, it must determine whether the evidence is of sufficient 'reliability' and 'probative value' to justify its use as a basis for the administrative decision.").  Special masters, unlike jurors, are sophisticated factfinders who do not require the protections of the Rules of Evidence.  Cf. 2 Admin. L. & Prac. § 5.52 (2d ed.) ("[T]he rules of evidence are designed to protect unsophisticated members of a jury and hence are not appropriate for hearings in which the trier of fact is sophisticated . . . ."  ).

[26] By explicitly permitting the special master to refrain from applying the Rules, the Ninth Circuit in Matley also implicitly permitted the District of Nevada to refrain from applying them when it adopted the special master's report.  Matley, 354 F.3d 1154; United States v. Alpine Land & Reservoir Co.,

Accordingly, neither the Special Master nor this Court are bound by the Rules of Evidence.  In any event, the bulk of the evidence challenged by Visa is admissible under the Rules of Evidence, for the following reasons.

### c. Visa's Hearsay Objections

#### i. State of Mind and Business Records Exceptions

Visa argues that various documents relied upon by the Special Master include the hearsay statements of bank employees, such as call reports and meeting minutes drafted by MasterCard employees.[27]  Visa argues that these documents fall within the state of mind exception to the hearsay rule only as to the state of mind of the MasterCard employee who drafted the document, not the state of mind of the bank employee quoted in the document. Visa also argues that these documents cannot fall within the business records exception because the bank employee owes no duty to MasterCard.[28]  See United States v. Bortnovsky, 879 F.2d 30, 34 (2d Cir. 1989).  Visa's position appears to be that the documents themselves are the hearsay statements of the MasterCard employees who drafted them, and the statements of the bank employees contained within the document are double-hearsay.

---

No. 3:73-CV-00185-RCJ, Doc. No. 153 (D. Nev. 2001) rev'd on other grounds 354 F.3d 1154.

[27] Evidence challenged on this basis includes, inter alia, MasterCard Exhibits 36, 41, 59, 61, 68, 94, 100, 104, 105, 109, 132, 137, 142, and 212.

[28] Evidence challenged on this basis includes, inter alia, MasterCard Exhibits 68, 104, 137, 263, 435, and 438.

With regard to the first layer of hearsay, the documents themselves are admissible as business records, and Visa withdrew its foundation objections with respect to them. (See Visa Reply 27 n.28.) ("Visa agrees to withdraw its objections to MasterCard's failure to meet the foundational requirements of Fed. R. Evid. 803(6).").) Moreover, it is irrelevant that the bank employees owe no duty to MasterCard, since the MasterCard employees who drafted the document owe a duty to MasterCard.

 With regard to the second layer of hearsay -- the statements of the bank employees quoted in the business records -- the declarants for state of mind purposes are the bank employees, not the MasterCard employees, since the bank employees made the statements whose reliability are at issue. See Fed. R. Evid. 801(b), 803(3). For instance, hearsay statements of a customer regarding the customer's reason for not dealing with a supplier are admissible to prove the customer's motives for not dealing with that supplier. See Hydrolevel Corp. v. Am. Soc. of Mech. Eng'rs, 635 F.2d 118, 128 (2d Cir. 1980); Stelwagon Mf'g Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1274 n.16 (3d Cir. 1995). Here, Visa and MasterCard supply network services to banks, and the statements of bank employees relate to the banks' reasons for dealing with one supplier rather than the other. Accordingly, the statements at

issue would not have been excluded as hearsay even if the
Special Master had applied the Federal Rules of Evidence.

### ii. Trustworthiness

Visa also argues that the challenged evidence is inherently
untrustworthy, and therefore inadmissible, even if it falls
within one of the hearsay exceptions.  See, e.g., Idaho v.
Wright, 497 U.S. 805, 819-20 (1990) (explaining that purpose of
hearsay rule is to ensure trustworthiness); Saks Int'l, Inc. v.
M/V "Export Champion", 817 F.2d 1011, 1013 (2d Cir. 1987) ("The
principal precondition to admission of documents as business
records pursuant to Fed. R. Evid. 803(6) is that the records
have sufficient indicia of trustworthiness to be considered
reliable.").  Specifically, Visa argues that (1) many documents
were created with an eye towards the instant litigation, and (2)
that statements made during business negotiations are not
trustworthy.[29]  For the following reasons, the challenged
evidence is sufficiently reliable and trustworthy to fall within
the state of mind or business records exceptions to the hearsay
rule.

---

[29] Visa's argument has little traction with regard to the state of mind
exception, since "relevant declarations which fall within the parameters of
Rule 803(3) are categorically admissible even if they are self-serving and
made under circumstances which undermine trustworthiness.  The truth or
falsity of such declarations is for the jury to determine, and their 'self-
serving nature' goes only to their weight."  United States v. Lawal, 736 F.2d
5, 8-9 (2d Cir. 1984).

1. Documents Colored by the Instant Litigation

The Court disagrees with Visa's argument that documents drafted by MasterCard employees after MasterCard filed its Motion to Enforce were colored by the active litigation in this case.[30]  The challenged documents are corroborated by documents created before MasterCard filed its Motion to Enforce.  See, e.g., Wright, 497 U.S. at 829-31 (discussing with approval "the considered wisdom of virtually the entire legal community that corroborating evidence is relevant to reliability and trustworthiness" of hearsay evidence).  Moreover, many of these documents are contemporaneous recordings or transcriptions of meetings or telephone calls, which also weighs in favor of reliability.  See, e.g., Doe v. Menefee, 391 F.3d 147, 170 n.20 (2d Cir. 2004); see also supra note 27 (listing call reports). For example, MasterCard Exhibit 61 contains the minutes of a meeting in which MasterCard employees characterize the SSF as an exit penalty.  MasterCard Exhibit 104 is an internal email exchange that characterizes the SSF as an exit fee.  Both are corroborated by MasterCard Exhibit 194, in which a senior Visa executive characterizes the SSF as "a formidable exit penalty." (MC Ex. 194 at 096080.)  This consistency supports the reliability and trustworthiness of the vast majority of the challenged documents.

---

[30] The evidence challenged on this basis includes, inter alia, MasterCard Exhibits 61, 94, 100, 104, 105, 109, 132, 137, 142, and 435.

Most of the documents drafted by MasterCard employees after MasterCard filed its Motion to Enforce contain the statements of employees of other banks. See supra note 30 (listing documents). The Court finds it implausible that these statements would have been colored by the instant litigation, because the declarants are not MasterCard employees. As to the concern that MasterCard employees may have fabricated or exaggerated these statements, most of these documents are corroborated by internal documents from the relevant bank or live testimony. For example, MasterCard Exhibit 105 is a MasterCard report outlining the contents of a telephone conversation between a MasterCard employee and a bank employee at BB&T listing the SSF as one reason why BB&T did not switch to MasterCard. This exhibit is consistent with and corroborated by MasterCard Exhibit 1, an internal document from BB&T that characterizes the SSF as a cost of conversion and an exit fee. MasterCard Exhibit 100 is MasterCard's response to a list of issues of concern produced by Washington Mutual in which both MasterCard and Washington Mutual characterize the SSF as an exit penalty. MasterCard Exhibits 109 and 132 also deal with Washington Mutual declarants. These exhibits are consistent with and corroborated by the live testimony of a senior vice president at Washington Mutual, Douglas Marshall. (See, e.g., Tr. 464.)

Mid

2. Statements During Negotiations

Visa next argues that the statements of bank representatives during sophisticated, high-stakes negotiations are not trustworthy because such statements may reflect mere posturing by the declarant for negotiation advantage.[31]  The Special Master understood and accounted for the potential for this type of puffery when he weighed the evidence.  (See, e.g., Report 16 ("Visa is correct that one should consider the record as to TCF with some skepticism . . . . [because TCF's CEO was] a shrewd businessman.  There is no doubt that he leveraged his criticism of the SSF . . . into a better financial package for his bank.")  This Court, equally mindful of these reliability problems, has likewise taken them into account in weighing the evidence.  See St. Pierre v. Dyer, 208 F.3d 394, 405 (2d Cir. 2000) ("[T]he self-serving nature of a witness's statements goes not to their admissibility but to their weight.").

Moreover, the statements made during negotiations are consistent with and corroborated by the internal statements of bank executives -- where the executives lack the same motive to posture or exaggerate.  For example, a MasterCard meeting summary reflects the same position as expressed in an internal Wells Fargo email message.  (Compare MC Ex. 59 at 14356 ("Any

---

[31] The evidence challenged on this basis includes, inter alia, MasterCard Exhibits 41, 59, 61, 68, 94, 100, 104, 105, 109, 132, 137, 142, 212, 263, 415, 434, 435, and 438.

new proposal [to Wells Fargo] must address . . . the new exit penalty imposed by Visa . . . ."), <u>with</u> MC Ex. 33 at 001 ("There should be no doubt in [MasterCard's] mind that getting [Wells Fargo's debit] business would require [MasterCard] to reimburse [the SSF]."))  The live testimony of a MasterCard executive, Bill Mathis, is corroborated by an internal email from an NCB executive, Sarah Hartman.  (<u>Compare</u> Tr. 219-20 (testifying that Sarah Hartman told him that the SSF was "the straw that has broken the camel's back" with respect to NCB's branding decision), <u>with</u> MC Ex. 6 ("Effectively, at this point, we have no option to move the CheckCard portfolio to MasterCard without incurring substantial penalties.  As I believe you are already aware, we are recommending staying with Visa, however this solidifies our recommendation."))

In sum, the vast majority of the challenged evidence would have been admissible under the Federal Rules of Evidence.  The Special Master based his findings on the testimony of Visa executives, as well as non-hearsay portions of internal Visa documents such as conversion analyses -- evidence to which Visa has no plausible objection.  Even if this Court were to disregard all the evidence challenged by Visa under the Rules, enough evidence would remain to easily show by a preponderance of the evidence that the SSF violates the Final Judgment.

V.    **"Effectively Prevents" vs. "Substantial Impediment"**

If the SSF "'effectively prevents' member banks from issuing cards on competing networks" then the SSF violates the Final Judgment.  (Order of Aug. 12, 2005 at 3 (interpreting Paragraph III.C of the Final Judgment).)  Visa argues that the Special Master did not apply this "effectively prevents" test. (Visa Obj. 15-20.)  Specifically, Visa argues that in order to violate the Final Judgment, the SSF must operate as a practical or de facto prohibition (Visa Obj. 15); "have the effect of stopping a bank from issuing cards on a competing network" (Visa Obj. 15); or "operate as a practical matter to prevent banks from leaving Visa" (Visa Obj. 17).  Visa argues that the Special Master applied a "substantial impediments" test instead.  (Visa Obj. 17-20.)  Visa bases this argument primarily on the following language in the Report:

> That brings me to the ultimate issue: as of October 15, 2004, did the SSF "effectively prevent" Visa banks from switching to MasterCard absent indemnification? On the record before me, the question must be answered affirmatively.  The SSF is of sufficient magnitude that no Visa issuer could treat it as other than a substantial impediment to brand switching.

(Report 35).[32]

Visa gives too much credit to too few words.  The Special Master's attention to the magnitude of the SSF impediment --

---

[32] The Special Master also characterized the SSF as "creating a substantial impediment" and "pos[ing] a formidable barrier" to brand switching.  (Report 13-14.)

that it is substantial -- is not an application of a new test.
Rather, it provides factual support for his conclusion that the
SSF effectively prevents banks from switching.  The Special
Master properly focused on evidence establishing how the SSF, as
a practical matter, operates to eliminate an issuer's ability to
switch networks.[33]

Accordingly, the Special Master applied the proper test.

**VI.   The Scope of the Remedy**

In order to give present and prospective effect to the
Final Judgment, the Court orders Visa to repeal By-Law 3.14 and
grants narrowly-tailored, conditional termination rights to
debit issuers that entered into agreements with Visa after the
SSF took effect on June 20, 2003.[34]

As set forth in greater detail in Part VII, _infra_ ("the
Remedy"), the conditions for termination are as follows: (1) a

---

[33] The Special Master made clear that he applied the proper test by citing
testimony and exhibits that track the language in the Court's Order of August
12, 2005.  For example, the Special Master cited evidence that the SSF would
"prevent a large Debit player from leaving" (Report 12 (quoting MC Ex. 194))
(emphasis added); "prevent MasterCard from making a debit brand proposal"
(Report 18 (quoting MC Ex. 94))(emphasis added); and "prevent brand
switching" (Report 13)(emphasis added).  The Special Master explicitly stated
in the last pages of his Report that the "ultimate issue" is whether the "SSF
'effectively prevent[ed]' Visa banks from switching to Mastercard."  (Report
35 (emphasis added).)  He also observed in the last few lines of the Report
that one bank executive "put the point in words that track the Court's order:
the SSF effectively will prohibit any large Visa [debit] issuer from making a
change to MasterCard."  (Report 36 (quoting (MC Ex. 8)(emphasis added));
Report 17 (emphasis added).)

[34] The Special Master did not specifically address remedy in his Report,
although he did discuss it in a conference with the parties on July 6, 2006.
(See Conf. Tr. 27-45.)  The Court held oral argument with respect to the
proper scope of the remedy on April 23, 2007.

terminating bank must enter into an agreement with MasterCard to issue MasterCard brand debit cards; (2) the bank must repay to Visa any unearned financial incentives as defined in its contract with Visa; and (3) the bank must terminate under these terms within two years of the date this Order takes effect.[35] This conditional termination remedy shall apply to all banks that entered into debit agreements with Visa after the SSF took effect, regardless of whether the contract was entered into prior to or after the Final Judgment's effective date, October 15, 2004.[36]

Visa objects to this remedy on three related grounds. First, Visa argues that the Court is not empowered to upset contractual agreements entered into prior to the effective date of the Final Judgment, since a party cannot violate a court order that is not yet in effect. (Visa Opp. 8-11.) Second, Visa argues that the Court cannot grant termination rights to

_____

[35] This is essentially the remedy that MasterCard seeks, with one exception. MasterCard argues that Visa's top 100 issuers who were subject to the SSF should be able to terminate their agreements with Visa if they seek to issue debit cards on any other general purpose card network, not just the MasterCard network. (See MC Adopt Mem. 4, 20, 22; Oral Arg. Tr. 4:4-16.) That aspect of MasterCard's proposed remedy is overbroad. The SSF violates the Final Judgment only insofar as it effectively prevents Visa banks from switching to MasterCard. It has no prohibitive effect on banks who contemplated switching to other general purpose card networks, because it was specifically tailored to apply only to banks who switch to MasterCard. See supra note 3. Moreover, at the time banks entered into the contracts at issue, no other general purpose card networks offered offline debit services. (Oral Arg. Tr. 36:19-22, 39:11-13.)

[36] According to Visa, only three banks entered into such agreements after October 15, 2004: Commercial Federal S&L Association, J.P. Morgan Chase/Bank One Corporation, and Compass Bank. (See Visa Opp. 9 n.11, 14-15.)

issuing banks because MasterCard did not challenge the SSF under the antitrust laws themselves.  Third, Visa argues that there is no evidence that the SSF actually affected the brand-switching decisions of many individual banks.  All of these objections lack merit.

Visa's first objection fails to appreciate the Court's broad equitable power to give present effect to its prior orders.  See supra Part II; Cf. Abrahamson v. Fleschner, 568 F.2d 862, 882 (2d Cir. 1977) ("Rescission is an equitable remedy.") (citing 5 Corbin on Contracts § 1103).  Visa's position also presumes the application of contempt standards. But this is not a contempt action, and no finding of contempt is necessary to give effect to the Final Judgment.  See supra Part II; Berger v. Heckler, 771 F.2d 1556, 1569 (2d Cir. 1985) (explaining that the court has the equitable power to ensure compliance with its prior orders even absent a finding of contempt); accord Alexander v. Hill, 707 F.2d 780, 783 (4th Cir. 1983).  The Court's remedy is not transformed into a contempt sanction simply because it may have negative economic consequences for Visa.  Its purpose is to give present effect to the Final Judgment, not to sanction Visa or to compensate MasterCard for harm that it may have suffered.  (See Oral Arg. Tr. 7:16-18, 37:11-17.)

While the agreements Visa entered into with member banks
prior to the effective date did not violate the Final Judgment
at the time they were executed, those contracts presently
violate the Final Judgment because they bind issuing banks to
Visa on terms negotiated pursuant to the SSF.  Visa cannot
continue to reap the benefits of those contracts now that the
Court has determined that the SSF effectively prevents Visa
debit issuers from switching to MasterCard in violation of the
Final Judgment.

Visa also overstates the scope of the Court's remedy.  The
Court is mindful of and sensitive to the fact that -- with
respect to the vast majority of the contracts at issue -- Visa
was not in violation of the Final Judgment at the time of
contracting.  This is in part why the Court is permitting Visa
to keep the benefit of its bargains to date, while also
requiring terminating banks to return any unearned incentives to
Visa.

To the extent, if any, that Visa may be economically harmed
through an earlier onset of competition for business, such harm
is mitigated because the vast majority of the contracts at issue
are set to expire in 2008 and are already under negotiation.
(Oral Arg. Tr. 25:15-26:4.)  The Court's remedy only accelerates
the negotiation process.  And in any event, the purpose of the

remedy is not to cause Visa economic hardship but rather to give prospective effect to the Final Judgment.

Visa is also hard-pressed to argue that the Court's remedy should not reach agreements entered into before the effective date of the Final Judgment.  Visa was on notice that the Court would consider granting termination rights to member banks if the Final Judgment were upheld on appeal.  (See Order of Dec. 8, 2003 at 5 n.3 ("[A]ssuming the Final Judgment is upheld on appeal and jurisdiction reverts to this Court, the Court -- if it finds that By-Law 3.14 violates the Final Judgment -- may fashion an appropriate remedy, including rescission of those contracts.").  Visa also had ample notice that Paragraph III.C of the Final Judgment "broadly prohibits exclusionary issuing rules."  United States v. Visa U.S.A., Inc., 183 F. Supp. 2d 613, 615 (S.D.N.Y. 2001).  When Visa signed most of its top issuers to long-term agreements in 2003 and 2004 despite this notice, it presumably determined that the rewards from the SSF would outweigh the potential cost of any future contract termination rights.  (See Oral Arg. Tr. 10:19-11:6, 43:2-44:12.) Equity will not permit Visa to avoid the remedy that it knew the Court could impose.

Second, Visa argues that the Court could grant termination rights only if MasterCard had successfully challenged the SSF under the antitrust laws themselves, since the antitrust laws

were in effect during the time before the effective date,
whereas the Final Judgment was not.  (<u>See</u> Conf. Tr. 37-39.)  As
Visa accurately observes, MasterCard chose not to do so and
instead challenged the SSF only through its Motion to Enforce
the Final Judgment.  While the Court certainly could grant
termination rights if MasterCard had shown that the agreements
at issue violated the antitrust laws themselves, MasterCard was
not required to do so.  A violation of the antitrust laws has
already been established.  The resulting Final Judgment was
crafted to promote competition without the need for another
full-blown antitrust action.  MasterCard has standing to enforce
the Final Judgment and does not have to initiate an entirely new
suit to give effect to that judgment.  It is sufficient that
MasterCard has shown that the agreements at issue presently
perpetuate the SSF, since the SSF violates the Final Judgment.

　　　　Finally, Visa argues that there is no evidence that the SSF
actually affected the brand-switching decisions of some banks
that entered into agreements with Visa after the SSF took
effect.  The Court has determined, based on the entire record,
that the SSF violates the Final Judgment and was unlawful as of
October 15, 2004.  The Court does not need further bank-specific
evidence to support its remedy.  MasterCard may have decided not
to approach such banks because it knew the SSF would render
futile any attempt to persuade them to switch.  (See Conf. Tr.

38

35.)  This would explain a dearth of proof with regard to a particular bank, but it would not render the SSF any less prohibitive.

* * * *

The remedy imposed here is fair and narrowly tailored to the purpose of giving present and prospective effect to the Final Judgment.  Paragraph III.C of the Final Judgment guarantees issuers the ability to make meaningful branding decisions free of prohibitions like the SSF.  Even though the Final Judgment became effective on October 15, 2004, none of Visa's top 100 issuers who entered into agreements with Visa after the SSF took effect will be able to exercise this guarantee until 2008 or later unless the Court permits those issuers to terminate their current agreements with Visa free from the SSF.  If the Court were merely to order Visa to repeal the SSF without granting termination rights, the Final Judgment would have no meaningful effect for nearly another year, and only partial effect for years to come.  The Court will not countenance a continuing violation of its order.

**VII. Remedy**

I. DEFINITIONS

As used in this Remedy:

    A.    "Visa" means Defendant Visa U.S.A., Inc.

B.    "MasterCard" means Defendant MasterCard International Incorporated.

C.    "By-Law 3.14" means Visa U.S.A. By-Law 3.14, adopted by the consent of the Visa Board of Directors on June 20, 2003.

D.    All terms explicitly defined in the Court's Final Judgment retain the same meaning in this Remedy.

II. PROHIBITED AND REQUIRED CONDUCT

A.    Visa shall repeal By-Law 3.14.

B.    Visa shall permit any Visa debit issuer who entered into an agreement with Visa on or after June 20, 2003 to terminate its agreement with Visa, provided that:

    i.  the terminating bank has entered into an agreement with MasterCard to issue MasterCard brand debit cards;

    ii.  the terminating bank has repaid to Visa any benefits or financial incentives that Visa provided to the issuer that the issuer has not yet earned under its agreement with Visa;

    iii.  the terminating bank complies with the foregoing terms within two years of the date this Order takes effect.

C.    Visa may not enforce any penalty provision or exit penalty against an issuer who so terminates its

agreement with Visa.  This provision shall not be
interpreted to prohibit Visa from receiving the
repayment of benefits or financial incentives under
Paragraph II.B.ii.

IV. ADDITIONAL PROVISIONS

    A.    This Remedy shall take effect ten (10) days after the
date on which it is entered.

    B.    Within sixty (60) days after the date this Remedy
takes effect, Visa and MasterCard shall provide a copy
of this Remedy to each of their directors, officers,
employees, and issuers.

    C.    The Court retains jurisdiction for the purposes of
enabling any of the parties to apply to the Court at
any time for such further orders or directions as may
be necessary or appropriate for (i) the construction
or carrying out of this Remedy, (ii) for the
modification of any of its provisions, (iii) for its
enforcement or compliance, and (iv) for the punishment
of any violations of its provisions.

**SO ORDERED:**

                                                **BARBARA S. JONES**
                                      **UNITED STATES DISTRICT JUDGE**

Dated:    New York, New York
            June 7, 2007

41

COPY MAILED / FAXED TO:
COUNSEL FOR PLTFF(S): ✓
COUNSEL FOR DFT(S): ✓
PLTFF PRO SE:
DFT. PRO SE:
DATE: 6/7/07
BY: MW